**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff/Respondent, | § | |
| | § | |
| V. | § | CR. No. C-05-542 (1) |
| | § | C.A. No. C-08-202 |
| DELVIN DEMON MOORE, | § | |
| Defendant/Movant. | § | |

**ORDER DENYING MOTION TO VACATE,
SET ASIDE OR CORRECT SENTENCE
AND DENYING CERTIFICATE OF APPEALABILITY**

Pending before the Court is Delvin Demon Moore's ("Moore") motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255, which was received by the Clerk on June 23, 2008. (D.E. 504.)[1] The Court ordered the government to respond (D.E. 505) and the government filed a combined response and motion to dismiss on October 26, 2008. (D.E. 534-35.) The United States filed a supplemental response on October 28, 2008, and several affidavits shortly thereafter. (See D.E. 537-39.) Moore has filed a number of motions and other documents with the Court, many of which have been addressed by prior orders of the Court. After receiving extensions of time to file his reply, Moore has filed two replies with various exhibits. (D.E. 559, 561.) The Clerk has also received several letters and affidavits from individuals in support of Moore's motion, which it has reviewed and considered. (D.E. 541, 554, 557-58.)

As discussed in detail herein, Moore's motion asserts fourteen grounds for relief. Most are subject to dismissal because he validly waived his right to file those claims. His claims that his plea was involuntary or unknowing and that he received ineffective assistance of counsel with regard to his plea, however, arguably fall outside the scope of his waiver. Nonetheless, these claims fail on

---

[1] Dockets entries refer to the criminal case, C-05-cr-542.

their merits.  Thus, his waiver is valid and enforceable.  For these reasons, the Court DENIES his

§ 2255 motion.  Additionally, the Court DENIES Moore a Certificate of Appealability ("COA").

## I.  JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 2255.

## II.  FACTS AND PROCEEDINGS

### A.      Summary of Offense[2]

Moore was a distributor of cocaine and marijuana in the north Baton Rouge and Zacahary,

Louisiana areas.  He was responsible for bringing large quantities of cocaine and marijuana from

the Rio Grande Valley of Texas to Louisiana.  Marte Silguero, who lived in the Rio Grande Valley.

obtained the drugs from various sources of supply, and then sold them to Moore.  Moore would

personally oversee the packaging and concealing of the narcotics and occasionally accompanied the

loads to Louisiana.  Moore also utilized a number of other individuals to drive loads of narcotics

through the U.S. Border Patrol checkpoints, including some of his co-defendants.  Several of these

trips resulted in the seizure of drugs, including the following:

> (1) an October 26, 1999 traffic stop in Chambers County, Texas in
> which Moore was driving and four others were with him resulted in
> the seizure of a loaded semiautomatic handgun with additional
> ammunition, and three bundles of cocaine with a net weight of 2.89
> kilograms;
>
> (2) an October 5, 2004 seizure at the U.S. Border Patrol Checkpoint
> of 76.81 kilograms of marijuana from a truck driven by co-defendant
> Tamiko Patton;[3]  and

---

[2]  The offense conduct as set forth herein is derived from Paragraphs 8 through 40 of the Presentence
Investigation Report ("PSR").

[3]  While Patton drove a rental vehicle, co-defendant Wolf drove a separate "spiked" vehicle in which
Moore was a passenger.  The spiked vehicle is one that will alert to the presence of drugs in order to distract
the drug service canine, but no drugs will be located in the spiked vehicle.  A traffic stop was conducted on

(3) an April 25, 2005 traffic stop in Jefferson Davis Parish in which co-defendant Monica Coleman was driving and Moore was a passenger resulted in the seizure of 5.67 kilograms of cocaine.

Additionally, on January 12, 2005, Moore was arrested after a traffic stop on a vehicle in which he was a passenger. Officers located $176,671 in U.S. currency, as well as counterfeit currency in a duffle bag claimed by the driver, Terry Wilson. The legal currency was wrapped in 27 bundles. Two of the bundles were at Moore's feet and the other 25 bundles were in a bag in the rear seat of the vehicle. Moore told officers that the money was his and was from his legitimate business as a rap music promoter. He later provided agents with a list of 36 persons who allegedly provided him money totaling more than $204,750 to promote their music.

While he was in jail after this arrest, on January 12 and 13, 2005, Moore made several telephone calls that were recorded. The recordings were later subpoenaed and reflected that Moore instructed co-defendant Delveccio Neff to take a safe containing money to co-defendant Monica Coleman's house and to hide it. He also instructed Neff to take some of the money and bail him and Wilson out of jail. Moore also instructed co-defendants Kela Collins and Walter Wolf to produce receipts totaling $175,000 and that the receipts should be signed with Moore's initials. He provided Collins and Wolf with several names and corresponding amounts which should appear on the receipts. Later, Kela Collins provided agents with faxed copies of a concert contract with Moore's signature and 14 pages of 50 receipts totaling more than $183,000. Some of the receipts, however, were dated during a period that Moore was incarcerated in Louisiana and several of the receipt

---

the spiked vehicle later. A record check revealed a parole warrant for Moore and he was arrested. While Moore denied knowing Patton, he stated that he spoke to her at a store south of the checkpoint. Further investigation revealed Moore's cellular telephone number in Patton's cell phone.

numbers did not correspond sequentially with the dates on which the receipts were supposedly written.

Additionally, on June 27, 2005, Moore brought a large number of witnesses to Corpus Christi prior to a federal grand jury meeting. Moore met with these witnesses, and told them what to say regarding the seized funds and Moore's music production business. He paid for their hotel rooms and meals and told witnesses that he would pay them a portion of the seized funds if the funds were returned to him. After testifying before the grand jury, several witnesses were questioned by Moore as to the content of their testimony.

**B.    Criminal Proceedings**

A number of superseding indictments were returned in this case, primarily to add new defendants as the investigation continued. Ultimately, Moore was charged in a Fourth Superseding Indictment that contained four counts. It charged Moore with: (1) conspiracy to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A) ("Count One"); (2) possession with intent to distribute approximately 5.5 kilograms of cocaine on April 28, 2005 ("Count Two"); (3) conspiracy to possess with intent to distribute more than 50 kilograms of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C); ("Count Three"); and conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(I), 1956(a)(1)(B)(I), and 1956(h) ("Count Four") (D.E. 283.)

**1.    Moore's Communications with Court and Moore's Attorneys**

Moore was initially represented by appointed counsel Jon Brooks. (D.E. 10, 12.) He later moved to substitute with retained counsel J. David Bourland, which the Court granted. (D.E. 27, 31.) Among other actions, Mr. Bourland filed a motion to suppress and motion to quash, which the

Court denied. (See D.E. 94.) The portion of the motion seeking suppression of information obtained from Moore's cell phone, which was seized on October 5, 2004 was denied as moot, because the government agreed not to use any information obtained from that phone in its case in chief. (D.E. 94 at 2.)

On January 30, 2006, AUSA Booth brought to the Court's attention that an unindicted co-conspirator, who would also be a witness, told her that he had previously been represented by Mr. Bourland, Mr. Moore's counsel. Although Mr. Bourland stated he had no record of that representation and did not remember that individual, he later notified the Court that he had in fact represented that individual. The Court determined that the conflict was non-waivable and removed Mr. Bourland from the case. (D.E. 164, Transcript of January 30, 2006 hearing; see also D.E. 446, Sealed Portion of Transcript from January 30, 2006; Minutes of January 30, 2006 Hearing.) Moore was instructed to obtain another attorney within two weeks. (Minutes of January 30, 2006 Hearing.)

Shortly thereafter, on February 13, 2006, the United States filed a motion requesting a hearing. (D.E. 113.) In that motion, the United States alleged that Moore was facilitating the sale or narcotics while incarcerated through the use of calls to several co-defendants, contrary to court order, and that two of those defendants had placed three-way calls for him. The United States was particularly concerned about harm Moore was threatening to family members of a witness expected to testify against him. (D.E. 113 at 1-2.) The Court scheduled a hearing and appointed John Gilmore to represent Moore at that hearing. (Minutes from February 14, 2006.) The Court granted the United States' motion and limited Moore to having written and telephone communication with his legal counsel only. (Id.)

Ten days later, Moore moved to substitute retained counsel Mark Sossi, which the Court granted. (D.E. 140, 143.)  At a motions hearing held on March 17, 2006 to address various motion filed by Mr. Sossi, Moore told the Court he was satisfied with his attorney.  (D.E. 443, Transcript of March 17, 2006 Motions Hearing at 30.)   At another hearing on March 27, 2006, Moore expressed some frustration with Mr. Sossi, and the Court questioned whether he wanted another attorney.  Moore told the Court that he wanted to "stay with" Mr. Sossi. (D.E. 437, Transcript of March 27, 2006 Hearing.)  In June 2006, Moore complained to the Court, via his attorney, that he was having difficulty contacting Mr. Sossi and that the jail was not allowing him adequate access to the phone.  (See generally D.E. 438, Transcript of June 12, 2006 Status Conference.)  Without making any findings as to the veracity of his allegations, the Court determined that Moore should be brought to the courthouse, to the U.S. Marshal's office, every Wednesday from 9:00 a.m. until noon, and permitted to place phone calls to Mr. Sossi.  Alternatively, Mr. Sossi could visit him at the courthouse during those times.  (D.E. 438 at 13-16.)  The Court issued this order to ensure that Moore had adequate access to his attorney.  (D.E. 438 at 12.)

On July 18, 2006, the Court held a hearing in the case to address a possible violation by Moore of the Court's order barring him from communicating with witnesses and co-defendants. Apparently, the jail where Moore was incarcerated found in his laundry a letter addressed to Kela Collins, who was originally a co-defendant in this case but was later removed in a superseding indictment.  (See generally D.E. 527, Transcript of July 18, 2006 Hearing.)  The Court did not take any action against Moore at that time, but warned him that if he violated the Court's order restricting his communication, there would be consequences. (D.E. 527 at 6.)   Moore testified that he understood.  (Id.)

Additionally, the Court discontinued at that time its requirement that Moore be brought to the courthouse each Wednesday, for several reasons. In part, Moore had been transferred to a facility closer physically to Mr. Sossi's office and therefore could visit with his attorney more easily.  Also, there had apparently not been any problems in communications between Moore and Mr. Sossi at his new facility. (D.E. 527 at 7-8.)

On August 21, 2006, the Court received a letter directly from Moore in which he indicated that he wanted a new counsel or to represent himself.  He also asked that attorney Jon D. Brooks assist him in filing the proper motions, if he represented himself.  (D.E. 309.)  The Court held a hearing in response to this motion on August 22, 2006.  (D.E. 441, Transcript of August 22, 2006 Hearing.)  Mr. Sossi and Moore both informed the Court that they had different ideas about how the case should be defended and that it was causing conflict.  The Court inquired as to whether Moore wanted to hire another attorney, and Moore said that he was not sure, but that he wanted to talk first to Mr. Brooks.  Mr. Brooks was called to the courtroom and spoke with Moore privately.  After that conversation, Moore told the Court that he wanted to stay with Mr. Sossi and try to work things out with him.  (D.E. 441 at 16.)

On October 30, 2006, Moore pleaded guilty to Count One of the Fourth Superseding Indictment pursuant to a written plea agreement.  The rearraignment proceeding is discussed in more detail in Section II.B.2 infra.

Days after his rearraignment, on November 2, 2006, the Court received a letter from Moore in which he asked to vacate his plea agreement or to post-pone his sentence.  He also stated that he his attorney had stopped Moore at the rearraignment from adding facts to the government's statement of what had occurred.   He asked for a hearing so that he could provide additional facts

to the Court and to the prosecutor.  (D.E. 347.)  The Court held a hearing to address Moore's letter

on November 17, 2006.  (See generally D.E. 440, Sealed Transcript of November 17, 2006 Hearing.)

Moore told the Court at that time that he thought "vacate" meant to "postpone," that he did not want

to vacate his plea agreement, and that Mr. Sossi remained an acceptable attorney to him.  (D.E. 440

at 3, 5-6.)        Moore wrote another letter to the Court before sentencing, which was  received by

the Court on December 28, 2006.  (D.E. 366.)  In it, Moore stated that his attorney "had not fully

explained everything" to him and that his attorney did not answer certain questions that he asked.

He also said there were certain words he did not understand "about conspiracy."  (D.E. 366 at 1.)

Again, the Court held a hearing to address the concerns raised in the letter.  (See Minutes from

January 10, 2007 Proceedings.)  At that hearing, the Court gave Moore the opportunity to ask

whatever questions he may have had.  He finally told the Court that he did not need clarification on

anything else.  (D.E. 447, Transcript of January 10, 2007 Hearing at 7.)

Less than a month later, Moore filed a *pro se* Motion to Dismiss Attorney of Record.  (D.E.

375.)  That motion asked to dismiss his attorney, and also included a motion to withdraw his guilty

plea based on incompetence at the time of the plea.  It further complained that his sentence had been

calculated with suppressed evidence.  (D.E. 375; D.E. 454, Transcript of February 8, 2007 hearing

at 2.) The Court held a hearing on his motion on February 8, 2007.  At that time, the Court excused

Mr. Sossi and appointed John Gilmore to represent Moore.  (D.E. 454, Transcript of February 8,

2007; see also D.E. 379-381.)

The next communication from Moore came in a letter, in which he requested to be allowed

to return to the general population.  The Court granted that request, but admonished Moore again

not to communicate with any co-defendants in the case.  (D.E. 382; Minutes dated March 2, 2007.)

8

After the Presentence Investigation Report had been prepared, and the sentencing continued several times, Moore sent a *pro se* letter motion again asking to be permitted to withdraw his guilty plea.  (D.E. 391.)  The Court again held a hearing as to his request and denied the motion.  (D.E. 456 Transcript of June 4, 2007 Hearing.)  The Court noted that Moore had repeatedly admitted his guilt even since the rearraignment, and that there would be prejudice to the United States from allowing him to withdraw it.  (D.E. 456 at 7-9.)  It thus denied his motion.  (Id.)

## 2.      Details of Moore's Rearraignment and Plea Agreement

As noted, Moore pleaded guilty to Count One of the Fourth Superseding Indictment on October 30, 2006.   In exchange for Moore's guilty plea and his waiver of appellate and § 2255 rights (discussed below), the government agreed to recommend that he receive maximum credit for acceptance of responsibility, to recommend a sentence at the lowest end of the applicable guideline range, and to move for the dismissal of all earlier indictments and the remaining counts in the Fourth Superseding Indictment against him at that time.  (D.E. 339-340; D.E. 340 at ¶ 2.)

The plea agreement included a voluntary waiver of Moore's right to appeal and to file a § 2255 motion:

> Defendant waives his/her right to appeal both the conviction and the sentence imposed.  Defendant is aware that Title 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed.  The defendant waives the right to appeal the sentence imposed or the manner in which it was determined.  The defendant may appeal only (a) a sentence imposed above the statutory maximum; or (b) an upward departure from the Sentencing Guidelines, which had not been requested by the United States, as set forth in 18 U.S.C. § 3742(b).   Additionally, the defendant is aware that Title 28, U.S.C. §2255, affords the right to contest or "collaterally attack" a conviction or sentence after the conviction or sentence has become final.  The defendant waives the right to contest his/her conviction or sentence by means of any post-conviction proceeding.

(D.E. 340 at ¶ 7 (emphasis in original).)   The agreement was signed by both Moore and his rearraignment counsel, Mark Sossi. (D.E. 340 at 6.)

At Moore's rearraignment, the Court specifically questioned Moore under oath to ensure that his plea was voluntary and knowing and to ensure that he understood and was voluntarily relinquishing his right to file a § 2255 motion.  The court specifically explained:

> **THE COURT:** ... Further, you are giving up your right in this plea agreement to file a post-conviction remedy, which ordinarily you would have a right to try to set aside your sentence and/or your conviction by filing a post-conviction remedy challenging such matters as jurisdiction or constitutionality or ineffective assistance of counsel, to name a few, but if you go forward today you also give up this right in addition to all the other rights that we have discussed. Do you understand these matters? Mr. Moore?
>
> **THE DEFENDANT**: Yes, Your Honor.

(D.E. 445, Rearraignment Transcript ("R. Tr.") at 32.)

Also at the rearraignment, Assistant United States Attorney Patti Booth summarized Moore's plea agreement, and explained – nearly verbatim – the portion of the plea agreement concerning the waiver of § 2255 rights. (R. Tr. at 35.)  Immediately following that summary, Moore testified that Ms. Booth had stated his plea agreement in its entirety and that he understood it.  (R. Tr. at 37.)  The Court showed Moore a written copy of the plea agreement.  Moore testified that the agreement was his, that he had signed the last page, and that he read it completely and discussed it completely with his attorney before he signed it. (R. Tr. at 38-39.)

Moore further testified that no one had promised him anything that was not in the written plea agreement, and that no one had promised him leniency or that he would get some type of downward departure or safety valve.  (R. Tr. at 38.)  He also told the Court that no one had forced him to plead guilty and that his decision to plead guilty was entirely voluntary.  (R. Tr. at 53.)

It is clear from the foregoing that Moore's waiver of § 2255 rights was knowing and voluntary.  See Fed. R. Crim. P. 11(b)(1)(N) (obligating court to ensure defendant understands any waiver of § 2255 rights and appellate rights prior to accepting his plea).

### 3.    Moore's Sentencing

The United States Probation Office prepared a Presentence Investigation Report ("PSR") that calculated Moore's base offense level as 32.  (PSR at ¶ 46.)  It added two levels pursuant to U.S.S.G. § 2D1.1(b)(1) because a firearm was possessed during the conspiracy and four levels pursuant to § 3B1.1(a) because of Moore's role as an organizer/leader in criminal activity that involved five or more participants or was otherwise extensive. (PSR at ¶ 46-49.)  The PSR also recommended a 2-level increase for obstruction of justice based on his attempts to have witnesses lie and his threats toward certain co-conspirators.  (PSR at ¶ 50.)  It recommended that Moore not be given any credit for acceptance of responsibility, noting that an adjustment for obstruction ordinarily indicates that a defendant has not accepted responsibility, and that this case was not the extraordinary case that would lead to a different result.  (PSR at ¶ 52 (citing U.S.S.G. ¶ 3E1.1, cmt. 4).)  His total offense level was thus determined to be a 40.  (PSR at ¶¶ 46-55.)    A Second Addendum to the PSR determined that he had a total of 7 criminal history points, establishing a criminal history category of IV.  (PSR at ¶¶ 59-62.)  His resulting guideline range was a term of imprisonment of 360 months to life.  (PSR at ¶¶ 83.)

Sentencing was held on June 22, 2007. (D.E. 399; see generally D.E. 457, Sentencing Transcript ("S. Tr.").)   At the beginning of sentencing, Moore's counsel, Mr. Gilmore, began to explain  to the Court that Moore's position was that he was not properly informed at the time he entered his plea.  He was now contending that he was guilty of possession of 2.8 kilograms of

11

cocaine arising from the 1999 stop, but not guilty of conspiracy. The Court noted that it had repeatedly entertained motions from Moore seeking to withdraw his plea and that each time he was brought in to court in response to such a request, he ultimately told the Court that he still wanted to plead guilty.

As explained by Mr. Gilmore, Moore thought that information derived from his cell phone would not be used against him, because of the Court's ruling on the motion to suppress, and he believed that information from that cell phone was being used to increase his guideline range. (S. Tr. at 4-5.) AUSA Booth explained that they did not use anything from Mr. Moore's cell phone, and further noted that the United States had a number of live witnesses that would come in and tie Moore to the people listed in his cell phone, and that it did not obtain witness names from the cell phone. The Court heard additional statements from Moore but then concluded that it would not allow him to withdraw his plea. (S. Tr. at 11-13.)

The Court heard from various witnesses at sentencing. They uniformly supported the factual information in the Presentence Investigation Report. Not only did they confirm the conduct underlying the conspiracy by confirming various trips made between south Texas and Louisiana to bring drugs for Moore to sell, but they also confirmed the conduct for which the PSR recommended Moore receive an enhancement for obstruction of justice. Specifically, witnesses testified that Moore had asked them to lie before the grand jury about the source of the $176,000 he had been found with. Witnesses also confirmed that Moore had asked them to falsify receipts regarding those funds. Additionally, one witness testified that she had made a three-way call for Moore when he was in prison during which Moore instructed a co-defendant, Derrick, to harm the family of another man who was testifying against Moore. Moreover, the testimony from the witnesses clearly

12

established that Moore was in charge of the others transporting the drugs for him, which numbered more than five people, that he was giving directions, and that he controlled the others. Thus, their testimony also supported the PSR's giving Moore additional points for his leadership role in the offense.

All of these witnesses were cross-examined by Moore's attorney. Indeed, the record reflects that Moore actively participated in the cross-examination of these witnesses, by writing down questions for his attorney to ask.

Moore also testified at his sentencing. He continued to make allegations during the sentencing that witnesses had lied when they testified or debriefed against him. (See, e.g., S. Tr. at 24, 26, 141-42, 146-49.) He also testified on his own behalf, and gave a similar account that he is now giving in his § 2255 motion regarding his interactions with Silguero. Specifically, Moore testified that Silguero gave Moore some type of drug, which caused Moore to become addicted to cocaine again, and that Silguero and two masked men who Moore believed were police officers apparently threatened him in order to get him to transport cocaine for them. (S. Tr. at 137-142.) He also claimed that the people who thought he had told them to make fake receipts misunderstood him, and that he wanted his "real receipts." He claims that he got angry with the people who made the fake receipts, because he didn't want to lie to the government, but that he "went along with it." (Id.)

After Moore's testimony, the Court issued its rulings. First, it sustained the defense objection to the scoring of a conviction for aggravated assault, and also determined that it would not sentence Moore using a larger amount of drugs, although the testimony at sentencing supported an increase. (S. Tr. at 150-152.) The Court overruled the remaining defense objections. (S. Tr. at 152.) The result was a total offense level of 40, a criminal history category of III, and a range of

13

imprisonment of 360 months to life.  (S. Tr. at 152.)  The Court imposed a term of imprisonment of 360 months, to be followed by a five-year supervised release term.  The Court also imposed a $10,000 fine and a $100 special assessment, and entered a final order of forfeiture for the $176,671 seized from Moore. (S. Tr. at 157-159; D.E. 399, 402.)  Judgment of conviction and sentence was entered June 29, 2007. (D.E. 402.)

Despite his waiver of appellate rights, Moore filed a timely notice of appeal, and the Court appointed Mr. Gilmore to represent Moore on appeal.  (D.E. 406, 409.)  On April 22, 2008, the Fifth Circuit issued a *per curiam* opinion affirming his conviction and sentence.  (D.E. 494.)  The Fifth Circuit described Moore's arguments on appeal as follows:

> Moore argues that the district court rejected his plea agreement by not awarding him credit for acceptance of responsibility even though the government agreed in the plea agreement to recommend that he receive such credit.  Because the plea agreement also contained an agreement that the government would dismiss the remaining charges against him, he maintains that the district court's alleged rejection of the plea agreement was erroneous under Fed. R. Crim. P. 11(c)(5). He additionally asserts that the district court should  have allowed him to withdraw his guilty plea because the government breached the plea agreement by not recommending that he receive credit for acceptance of responsibility.

(D.E. 494 at 1-2.)  The Fifth Circuit addressed his claims on their merits and concluded that the district court had not rejected Moore's plea agreement and that he had failed to show he was prejudiced by any government failure to recommend that he receive acceptance of responsibility. In particular, the appellate court noted that his testimony at sentencing was contradicted by five government witnesses and that Moore did not challenge on appeal the conclusion of the government and the district court that he committed perjury.  (D.E. 494 at 3.)

14

Moore's timely § 2255 motion was received by the Clerk on June 23, 2008. (D.E. 504.) He has since filed a number of other motions, all of which have been addressed by the Court and which do not impact the Court's rulings herein. For the reasons set forth in this Order, Moore's § 2255 motion is DENIED.

### III.  MOVANT'S ALLEGATIONS

Moore's § 2255 motion lists fourteen different grounds for relief. Each is discussed separately below. Moore's first ground for relief is a claim focused on what he calls the "Judge's bias, Impartiality, Discrimination, and Dictatorship." (D.E. 504 at 4.) In support of this claim, he alleges various facts concerning the Court's appointment of counsel to him and various co-defendants, and claims that the Court determined he was guilty before reviewing the evidence or evaluating his defense. He also alleges that the Court interfered with his ability to communicate with counsel of his choice and that there was "zero possibility" for him to have a fair trial before this Court or in Corpus Christi, Texas. (D.E. 504 at 4.)

His second ground for relief is essentially a claim of prosecutorial misconduct. Specifically, he alleges that AUSA Patricia Hubert Booth made false statements to the Court and engaged in conduct involving dishonesty, fraud, or misrepresentation. (D.E. 504 at 6-8.)

Moore's third ground for relief alleges that he was denied effective assistance of counsel. He lists a number of alleged facts in support of this claim. First, he again complains that the attorney of his choice, David J. Bourland, was found to have a conflict and that he was appointed a different counsel. Second, he claims that the Court intimidated his second retained counsel, Mr. Sossi, by "arguing" with him, fining him, and sanctioning him to such an extent that Mr. Sossi "willfully deceived the defendant into pleading guilty." (D.E. 504 at 9.) He claims that he did not want to

15

plead guilty and that he wanted to try to enter a not guilty plea and go to trial, but that Mr. Sossi convinced him to plead guilty through deception.  Moore further alleges that, during a break in his rearraignment, Mr. Sossi deceived him by telling him that his sentence would start off at seven years, that the prosecutor was promising him no enhancements and that he would receive a fifty percent reduction in sentence and "rule #35 just for admitting guilt," but that Moore could not say that in open court.  Mr. Sossi also allegedly told him that, if the PSR did not give him what he was promised, then he could withdraw his plea  at that time and proceed to trial.  Allegedly, Mr. Sossi also told him that if he failed to plead guilty, then the AUSA was "going after all of [his] witnesses" and that his mother and father "would be next." (D.E. 504 at 10.)  Third, he alleges that Mr. Sossi was basically unprepared in the case and failed to do things such as interview the prosecution's witnesses, interview defense witnesses, show Moore discovery or let him listen to recordings, and that the pre-trial motions he filed with the Court were all denied.  Fourth and finally, he alleges that John Gilmore was ineffective because he failed to raise ineffective assistance of counsel claims on appeal, and also failed to raise the claim that Moore was "mentally and physically tortured into pleading guilty."  (D.E. 504 at 10.)

In his fourth ground for relief, Moore again claims that his guilty plea was obtained by use of a "coerced confession."  He claims that his counsel coerced him and that unnamed United States Marshals who were escorting him to Court harassed and intimidated him into pleading guilty. (D.E. 504 at 11.)

Moore's fifth ground for relief again challenges the voluntariness of his plea, albeit in more stark terms.  In this claim, he alleges that he was "mentally and physically tortured" into pleading guilty.  He faults the conditions at various places where he was incarcerated prior to his

rearraignment for his "torture."  For example, he claims that he was starved while held at Karnes

County Correctional Center and was not given food for 20 days while in segregation.  He claims that

he was again "slowly starved" at Nueces County Jail and denied bean-free trays, denied hot balanced

nutritious meals, medical treatment, recreation, drinking water and warmth.  At Jim Wells County

Jail, he was allegedly denied warmth (due to the air conditioning set on "about 55 degrees"), denied

recreation, denied water for 6 days, and given small amounts of food to slowly starve him.  He

complains that he was placed in segregation for nearly two years and subjected to unsanitary and

hazardous living conditions.  He claims that the combined force of these conditions caused him to

believe that his jailers were trying  to allow him to die and that this led him to plead guilty.[4]

Moore's ground six is that the United States engaged in "outrageous government conduct"

and "excessive involvement" in criminal activity.  He argues that the government created the entire

conspiracy because a "Special Agent" co-conspirator, Silguero,[5] exploited Moore because he knew

he was a user and threatened him with imprisonment if he did not comply with orders.  (D.E. 504

at 14-15.) This appears to relate to a claim he made at sentencing, that he engaged in the criminal

conduct only under duress.

In his seventh ground for relief, Moore again argues that his guilty plea was unlawfully

induced and not voluntary.  He claims that he told the Court in letters that he did not understand all

---

[4]  Notably, the affidavit of Immigration and Customs Enforcement Special Agent Aaron Rodgers avers that the records relating to Mr. Moore at each of his places of incarceration do not indicate that he complained of any mistreatment that was not rectified.  He did not at any time make the extensive complaints that he now raises.  (D.E. 539, Rodgers Aff. at 3-4.)

[5]  Special Agent Rodgers flatly denies that Silguero was a special agent or worked for the government.  Rodgers avers: "Silguero is not an employee of the government and was only able to provide historic information as to Delvin Moore's drug smuggling operation."  (D.E. 539, Rodgers Aff. at 2, ¶ 3.) There is no evidence in the record to the contrary, only Moore's unsupported allegations.

the words being used and that his attorney had not fully explained everything to him.  He also repeats his complaints about being in isolation and starved, which he claims disrupted his senses at his initial pleading.  (D.E. 504 at 16.)

Moore's eighth ground claims that evidence against him was "fruit of the poisonous tree" because it was obtained from a cell phone that had been seized by authorities, and which the Court suppressed because the search was warrantless.  (D.E. 504 at 17.)

In his ninth ground for relief, Moore claims that his arrest on January 12, 2005 was unlawful. Because it was that arrest that resulted in the seizure of evidence of cash in his possession totaling $176,671, he claims that the unlawfully seized evidence should have been suppressed and that his attorney Mr. Sossi failed to file a proper motion to suppress the evidence.  Had the motion to suppress been filed, Moore claims the outcome of this case would have been different. (D.E. 504 at 17.)

Moore's tenth ground for relief is titled as one that his conviction was obtained by a violation of the privilege against self-incrimination.  (D.E. 504 at 19.) Again, he points to his jail conditions prior to his plea, his attorney's alleged deception, and the fact that the United States kept issuing superseding indictments and "harassing [him] relentlessly."  He argues that he would have been acquitted at trial, had he been permitted the opportunity to take his case to trial. (D.E. 504 at 19.)

Moore's eleventh ground for relief alleges that the prosecution failed to disclosure exculpatory evidence to him.  His supporting allegations are somewhat unclear, but he appears to be claiming that the United States should have disclosed his co-conspirators' testimony before the grand jury and testimony given in a Louisiana money laundering investigation.  Additionally, he appears to be claiming that Special Agent Rodgers' testimony at the emergency hearing held on

February 14, 2006 and transcripts from the grand jury of all witnesses should have been produced to him.  (D.E. 504 at 20.)

In his twelfth ground for relief, Moore makes an allegation that he repeatedly made during the course of his criminal proceedings, i.e., that the investigation against him was racially motivated and that Special Agent Rodgers and a Narcotics Task Force Officer made racist remarks to him.  He also claims that Rodgers, Marte Silguero and a John Doe special agent officer committed perjury during Moore's pretrial and sentencing hearings and that their motivation was race-based. (D.E. 504 at 20.)

Moore's ground thirteen challenges the jurisdiction of this Court.  He claims he committed no crime in Corpus Christi, in Kleberg County or in Annahauc Chambers County, Texas.  He also appears to be arguing that this Court did not have jurisdiction to rule on a motion to suppress evidence seized in Louisiana. (D.E. 504 at 21.)

In his fourteenth and final ground for relief, Moore claims that the United States retaliated against defense witnesses.  He specifically claims that a United States Marshal took an envelope from his pocket while transporting him that contained witnesses' identities, some testimony and their addresses.  He claims that after this document was taken from him, the witnesses listed and family members of his were harassed, threatened, and charged in indictments. (D.E. 504 at 21.)

In its response, the United States argues that most of Moore's claims are barred by his knowing and voluntary waiver of § 2255 rights.  Of those claims that fall outside the scope of the waiver, the government argues that they fail on their merits.  In support of its response, the United States has provided affidavits from AUSA Booth, the prosecuting attorney in Moore's criminal case, and Special Agent Rodgers, who was a lead investigator in Moore's case.

As noted, Moore has filed several replies and a number of individuals have also submitted affidavits in support of his application.  One of these, an affidavit from Rodriguez Turner, claims that Mr. Turner heard co-defendant Monica Coleman stating that she "was going to lie on Delvin Moore because he would not go talk to her and was in the room with Kela Collins."  (D.E. 558, Turner Aff.)  In another, an affiant named John Whitley testifies that he was with Moore when Moore was stopped on October 26, 1999 and that the handgun found in the vehicle was left there without anyone's knowledge by the affiant's aunt, that the gun was registered to another of his relatives, and that neither he nor Moore had knowledge of the gun. (D.E. 554, Whitley Aff.)

There are three basic themes to the remaining affidavit testimony from all the witnesses.  The first is that the affiants in fact provided money to Moore in conjunction with his music business, again an apparent effort by Moore to establish a legitimate source for the monies he has already forfeited.  (D.E. 557, Rosalyn Lee Aff.;  D.E. 558, Turner Aff.; D.E. 541, Robert Lee Aff.)  The second is that Special Agent Aaron Rodgers threatened them or otherwise tried to obtain evidence or testimony from them through intimidation when he interviewed them about payments to Moore in Baton Rouge, Louisiana.  (D.E. 557, Rosalyn Lee Aff.; D.E. 541, Robert Lee Aff.).  The third theme is that these witnesses were available for trial, but that they either were not contacted by Moore's attorneys, the trial date kept changing which made it inconvenient for them, or the witnesses feared for their safety based on the "threats" by Mr. Rodgers.  (See D.E. 558, Turner affidavit, D.E. 554, Whitley Affidavit; D.E. 557, Rosalyn Lee Aff.)[6]

---

[6]   The Court eyes these affidavits submitted by four individuals on behalf of Mr. Moore with a healthy degree of skepticism.  Notably, the PSR recounts numerous instances in which Moore has successfully encouraged others to falsify documents or lie under oath to benefit him.  Additionally, a number of individuals testified at sentencing and at other proceedings in the case that Moore asked them to lie about their conduct or his involvement with it.  There was also throughout the case a clear sense that some witnesses and co-defendants felt afraid of Moore.  Given the threats Moore made from jail to harm the family of one

The court has considered all the affidavits submitted and filings by the parties.  For the reasons set forth herein, Moore's claims fail.

## IV.  DISCUSSION

**A.      28 U.S.C. § 2255**

There are four cognizable grounds upon which a federal prisoner may move to vacate, set aside or correct his sentence: (1) constitutional issues, (2) challenges to the district court's jurisdiction to impose the sentence, (3) challenges to the length of a sentence in excess of the statutory maximum, and (4) claims that the sentence is otherwise subject to collateral attack.  28 U.S.C. § 2255; United States v. Placenta, 81 F.3d 555, 558 (5th Cir. 1996).  "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice."  United States v. Vaughan, 955 F.2d 367, 368 (5th Cir. 1992).  "[A] collateral challenge may not do service for an appeal."  United States v. Fray, 456 U.S. 152, 165 (1982).

---

witness, that fear certainly may have been well-founded.

The Court further notes that there is ample evidence in the case (and one of the affiants admits) that the persons interviewed by Agent Rodgers recorded those interviews at Moore's request and then gave the recordings to Moore. (See D.E. 557, Rosalyn Lee Aff.)  Again, this fact makes it unlikely, at least in the Court's mind, that any of these witnesses would have told the agent of any illegal actions on the part of Moore, or would have admitted in those interviews to anything Moore did not want them to admit to.  For all of these reasons, based on Moore's history in this case, the Court questions the reliability of these affidavits.

Additionally, Mr. Whitley's testimony that the firearm found in the vehicle driven by Moore (and used to increase his offense level by 2 levels), did not belong to Moore and that neither Moore nor Whitley was aware of its presence in the vehicle, does not relate to any of Moore's claims.  Moore did not challenge at sentencing, and does not challenge now, the increase to his offense level based on his possession of a firearm.  Additionally, a witness testified at sentencing that he knew Moore had weapons and had seen weapons in the house that Moore was living in. (S. Tr. at 95.)

In any event, even if these witnesses had appeared at sentencing and testified consistent with their affidavits, it would not change the outcome of this Order.  These affidavits relate to claims Moore has validly waived his right to bring in these § 2255 proceedings.

21

The Court need not address whether Moore has procedurally defaulted his claims by failing to raise them on appeal, as the United States argues. Rather, the Court concludes that he validly waived all of the claims unrelated to his plea, and those claims are thus subject to dismissal. See infra Section IV.C.; United States v. Wilkes, 20 F.3d 651 (5th Cir. 1994) (enforcing defendant's voluntary and knowing waiver of § 2255 rights).

Moore's motion contains several claims, however, that challenge the validity of his plea. These claims fall outside the scope of his § 2255 waiver. See, e.g., United States v. White, 307 F.3d 336, 343-44 (5th Cir. 2002) (an ineffective assistance claim survives a waiver "only when the claimed assistance directly affected the validity of that waiver or the plea itself"); United States v. Branam, 231 F.3d 931, 931 n.1 (5th Cir. 2000) (considering defendant's argument that United States breached the plea agreement, despite an appeal-waiver provision in the plea agreement). Thus, the Court turns first to these claims.

## B.   Challenges to Plea

Moore offers various explanations as to why his plea was involuntary. These include the claim that he was not mentally competent because he had been in solitary confinement and otherwise treated poorly prior to his plea, that United States Marshals escorting him to Court had intimidated him into pleading guilty, that his counsel was ineffective with regard to his plea, and deceived him into believing he would get a lower sentence, and that the United States' issuance of superseding indictments constituted relentless harassment and that he pleaded guilty to stop the harassment.

The record of the proceedings in this case, and particularly the rearraignment transcript, during which the Court took pains to establish a knowing and voluntary plea, make clear that

Moore's challenges to his plea at this time are without merit.  His plea was knowing and voluntary, and he later repeatedly affirmed his desire to maintain his guilty plea.

### 1.    Ineffective Assistance of Counsel As to Plea

An ineffective assistance of counsel allegation presented in a § 2255 motion is properly analyzed under the two-prong analysis set forth in Strickland v. Washington, 466 U.S. 668 (1984). United States v. Willis, 273 F.3d 592, 598 (5th Cir. 2001).  To prevail on a claim of ineffective assistance of counsel, a movant must demonstrate that his counsel's performance was both deficient and prejudicial.  Id.  This means that a movant must show that counsel's performance was outside the broad range of what is considered reasonable assistance and that this deficient performance led to an unfair and unreliable conviction and sentence.  United States v. Dovalina, 262 F.3d 472, 474-75 (5th Cir. 2001).  If the movant fails to prove one prong, it is not necessary to analyze the other. Armstead v. Scott, 37 F.3d 202, 210 (5th Cir. 1994), cert. denied, 514 U.S. 1071 (1995) ("A court need not address both components of the inquiry if the defendant makes an insufficient showing on one"); Carter v. Johnson, 131 F.3d 452, 463 (5th Cir. 1997) ("Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim.").

Moore argues that his attorney, Sossi, deceived him into pleading guilty by telling him that his sentence would start off at seven years, and that he would receive a fifty percent reduction in his sentence just by admitting guilt.  Allegedly, Sossi also told him that if the PSR did not give Moore what he was promised, then he could withdraw his plea at that time.  He also argues that Sossi was deficient because Sossi did not fully explain everything to him.  When viewing the record as a whole, it is clear that Moore cannot show prejudice and thus is not entitled to relief as to his claim.

Notably, Moore denied under oath at his rearraignment that anyone had promised him anything other than what was in the written document.  (See R. Tr. at 37  (Moore denying that anyone had made any other promises outside of the written plea agreement, and denying that anyone had offered him leniency or a motion for downward departure).)  Moreover, Moore testified that he understood that even his attorney's opinions of the guidelines might not be the same as the Court's, and that the final decision as to what his sentence would be rested with the Court.  (R. Tr. at 52-53.)

Because Moore's sworn testimony at the rearraignment directly refutes the claim he now makes, he may proceed on such a claim only under narrow circumstances. See United States v. Cervantes, 132 F.3d 1106, 1110 (5th Cir. 1998).  Specifically, a defendant may seek habeas relief on the basis of alleged promises, even though inconsistent with his representations in open court, by proving: (1) the exact terms of the alleged promise; (2) exactly when, where, and by whom the promise was made; and (3) the precise identity of an eyewitness to the promise. 132 F.3d at 1110. A defendant is entitled to an evidentiary hearing on the issue if he can produce evidence showing the merit of his allegations, typically in the form of an affidavit from a reliable third party.  Id. Moore has not alleged any facts about the identity of any witnesses to the promise, and has not provided any other evidence showing the merit of his allegations.  Thus, he is unable to obtain relief under the Cervantes exception.

Moreover, in order to show prejudice arising from an attorney's ineffective assistance during the plea negotiations or the plea itself, Moore must show that, absent his counsel's deficiencies, he would have proceeded to trial.  See United States v. Glinsey, 209 F.3d 386, 392 (5th Cir. 2000) (in order to show prejudice as a result of ineffective assistance during the guilty plea process, a defendant "must show that there is a reasonable probability that, but for counsel's errors, he would

24

not have pleaded guilty and would have insisted on going to trial") (citing Hill v. Lockhart, 474 U.S.

52, 59 (1985)).  This is a showing that cannot be met here.  The rearraignment transcript clearly

establishes that Moore's decision to plead guilty was his own and that it was entirely voluntary.

At his rearraignment, Moore testified that he had had enough time to talk with his attorney,

that he had told his attorney everything he knew about the case, and that his attorney had answered

all of his questions, that his attorney came to see him in jail and took his phone calls.  (R. Tr. at 23.)

The Court informed Moore of the various trial rights available to him, and he testified that he

understood them.  (R. Tr. at 25-33.)

Consistent with Rule 11, Fed. R. Crim. P., the Court explained to Moore the maximum

punishment that he might receive.  Specifically, the Court informed him that he faced a mandatory

minimum of ten years in prison and could be sentenced to a maximum punishment of life

imprisonment.  (R. Tr. at 39.)  The Court also informed him that there was a mandatory $100 special

assessment, a maximum fine of $4 million, and a minimum supervised release term of five years

with a maximum supervised release term of life.  (R. Tr. at 39.)  Moore testified that he understood.

(R. Tr. at 39.)  Notably, Moore further testified that there had not been any other agreements or

promises made to him that were not in the written plea agreement, and that no one had promised him

leniency or that he would get a motion for downward departure.  (R. Tr. at 37.)  He later testified

that he was pleading guilty because he was guilty.  (R. Tr. at 60.)

Moore told the Court that his attorney had discussed with him how the Sentencing

Guidelines might apply in his case and that he understood that certain facts could increase his

sentence.  (R. Tr. at 41-45.)  The transcript also establishes that Moore and his counsel took a break

to discuss matters further after discussing various parts of the sentencing guidelines that might apply

to him to increase his advisory guideline sentence.  After that break, Moore told the Court that he understood everything now and that he did not want any more time with his attorney.  (R. Tr. at 52.)

Moore's sworn statements in open court are entitled to a strong presumption of truthfulness. United States v. Lampaziane, 251 F.3d 519, 524 (5th Cir. 2001) (citing Blackledge v. Allison, 431 U.S. 63, 74 (1977)).  Indeed, the Fifth Circuit affords "great weight to the defendant's statements at the plea colloquy."  United States v. Cothran, 302 F.3d 279, 283-84 (5th Cir. 2002).  Put simply, Moore's sworn statements preclude the relief he seeks here.  He knew of the potential punishment he faced, he knew that any estimates by his attorney were not binding on the Court, and his plea was knowing.  Moreover, he testified that his decision to plead guilty was voluntary and that no one had forced him to plead guilty.  He also stated that no one had promised him anything other than what was in his plea agreement.

In short, Moore cannot overcome his testimony at the rearraignment – which clearly established a knowing and voluntary plea – to now show that he would have insisted on going to trial but for counsel's performance.  Thus, Moore cannot prove the prejudice prong of the Strickland inquiry, and it is unnecessary to determine whether his counsel's performance was deficient.  His claims of ineffective assistance with regard to his plea fail on their merits.

### 2.    Remaining Challenges to Plea

The Court has reviewed his remaining challenges to his plea agreement and also finds them to be meritless.  All of these claims suffer from the same fatal flaw: he has raised them all previously before the Court and thereafter confirmed his guilt or the Court has previously denied them.  As described in Section II.B.1. supra, Moore repeatedly made attempts to question and challenge his guilty plea before he was sentenced and even again at sentencing.  Repeatedly, he was brought into

the courtroom, given an opportunity to consult with his counsel, and repeatedly he told the Court

he did not want to withdraw his guilty plea.  His repeated confirmations of his guilt make clear to

the Court that his guilty plea and his waiver of § 2255 rights are valid and enforceable.

Indeed, as the Court noted at sentencing, Moore's conduct and vacillation with regard to his

decision to plead guilty has been outrageous.  The Court has reviewed his renewed challenges to his

plea and finds them lacking in merit, in light of the record as a whole.  Accordingly, those claims

are denied.

Because the Court concludes that Moore's plea and his § 2255 waiver are enforceable, it is

unnecessary to address his remaining claims on their merits.  His remaining claims all fall within

the scope of his waiver and are therefore barred from consideration here.

## C.      Waiver of § 2255 Rights

As noted, it is clear from the rearraignment that Moore understood that he was waiving his

right both to appeal (except under certain circumstances) and to file any § 2255 motions, all that is

required for his waiver to be enforceable.  See Wilkes, 20 F.3d at 653 (waiver is knowing if

defendant understood he had a right, and understood he was giving it up).  Again, Moore's

statements under oath are entitled to a strong presumption of truthfulness.  Wilkes, 20 F.3d at 653;

Cothran, 302 F.3d at 283-84.  Those statements support the Court's conclusion that his wavier was

knowing and voluntary.  Moore's remaining claims fall within the scope of that waiver.

In sum, while Moore's challenges to his plea are denied on their merits, his remaining claims

fall within the scope of his waiver. Therefore, they are not properly before the Court.  For these

reasons, Moore's § 2255 motion is DENIED in its entirety.

**D.      Certificate of Appealability**

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."  28 U.S.C. § 2253(c)(1)(A).  Although Moore has not yet filed a notice of appeal, this Court nonetheless addresses whether he would be entitled to a COA.  See Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000) (a district court may *sua sponte* rule on a COA because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court. Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A COA "may issue...only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits."  Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).

To warrant a grant of the certificate as to claims denied on their merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  This standard requires a § 2255 movant to demonstrate that reasonable jurists could debate whether the motion should have been resolved differently, or that the issues presented deserved encouragement to proceed further. United States v. Jones, 287 F.3d 325, 329 (5th Cir. 2002) (relying upon Slack, 529 U.S. at 483-84).

As to claims that the district court rejects solely on procedural grounds, the movant must show both that "jurists of reasons would find it debatable whether the petition states a valid claim

28

of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  <u>Slack</u>, 529 U.S. at 484 (emphasis added).

Based on the above standards, the Court concludes that Moore is not entitled to a COA as to any of his claims.  That is, reasonable jurists could not debate the Court's resolution of his challenges to his plea.  Similarly, jurists of reason would not find it debatable that his valid and knowing waiver precludes consideration of his remaining claims.

## V.  CONCLUSION

For the above-stated reasons, Moore's motion under 28 U.S.C. § 2255 (D.E. 504) is DISMISSED WITH PREJUDICE.  The Court also DENIES Moore a Certificate of Appealability.

It is so ORDERED this 6th day of March, 2009.

Janis Graham Jack
United States District Judge

29